### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **WALTER POWERS, JR., et al.** | **CIVIL ACTION** |
|    **Plaintiffs** | |
| **VERSUS** | **NO. 13-5993** |
| **NEW ORLEANS CITY, et al.** | **SECTION "E"** |
|    **Defendants** | |

### FINDINGS OF FACT & CONCLUSIONS OF LAW

This matter was tried before the Court, sitting without a jury, from February 5, 2014 to February 7, 2014.[1]  Having considered the testimony and evidence at trial, the pre-trial briefs submitted by the parties, the arguments of counsel, and the applicable law, the Court now issues the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a).  To the extent that any findings of fact may be construed as conclusions of law, the Court hereby adopts them as such. To the extent that any conclusions of law constitute findings of fact, the Court adopts them as such.

### BACKGROUND AND PROCEDURAL HISTORY

On January 11, 2013, the Court approved a Consent Judgment between the City of New Orleans and the United States.[2]  On September 27, 2013, the United States Court of Appeals for the Fifth Circuit affirmed entry of the Consent Judgment.  *United States v. City of New Orleans*, 731 F.3d 434 (5th Cir. 2013).  Those orders and opinions set forth the background of this matter.

---

[1] R. Doc. 182 (Minute entry from first day of bench trial); R. Doc. 183 (Minute entry from second day of bench trial); R. Doc. 184 (Minute entry from third and final day of bench trial).

[2] *United States v. City of New Orleans*, No. 12-1924 (filed July 24, 2012), R. Doc. 159 (granting joint motion to enter Consent Judgment); R. Doc. 256 (denying motion to vacate consent decree).

As relevant to this case, the Consent Decree mandated reforms of "paid detail" work, or secondary law enforcement employment by NOPD officers.[3]  In particular, pursuant to the Consent Decree the City of New Orleans was obligated to establish a Secondary Employment Coordinating Office with "sole authority to arrange, coordinate, arrange fully-auditable payment, and perform all other administrative functions related to NOPD employees' off-duty secondary law enforcement employment (historically referred to as paid details)."[4]  The Consent Judgment also dictated that "[a] schedule of fees will be established by the City to offset costs associated with the coordination and required support provided through the Coordinating Office to take into account costs, including but not limited to, administrative fees, hourly wage rates, and equipment usages."[5]

To comply with this requirement, the City of New Orleans, through actions by the City Council and the Mayor, passed a series of ordinances establishing the Office of Police Secondary Employment ("OPSE") and setting rates for secondary employment.  *See* New Orleans Ordinances 25428 M.C.S. 90-121, 90-122; 25429 M.C.S. 70-415.244–70–

---

[3]Consent Judgment, p. 85-94.  "Secondary employment" and "paid detail" are not defined in the Consent Decree.  Under pre-Consent Decree NOPD policy, "paid detail" was defined as "The off-duty employment, for compensation, of any employee of the Department by another individual, business, establishment, or organization where the employee is performing the duties of a police officer or a function of the police department."  NOPD Operations Manual 22.8, Ex. 1 at 00001.  Under one of the Ordinances challenged in this lawsuit, "secondary employment" is defined as "security or police-related work performed for compensation by an NOPD officer or employee during his or her off-duty hours.  Formerly known as 'paid details,' or simply 'details.'"  Ex. 5 at 00315.  The terms "paid detail" and "secondary employment" are more aptly described in the recently enacted Ordinance and this is the definition employed in this opinion.  Regardless of the label, secondary employment is voluntary, off-duty work for private third-party employers.

[4]*Id.* at ¶ 332.

[5]*Id.* at ¶ 348.

415.246; Ordinance Cal. Nos. 29,656, 29,657 ("the Challenged Ordinances").[6]

Plaintiffs Captain Frederick C. Morton and Sergeant Walter Powers, Jr., both NOPD officers, commenced this action by filing a petition in Civil District Court for the Parish of Orleans against the City and the Civil Service Commission ("CSC").  In their petition, Plaintiffs allege (1) the City "usurped Defendant CSC's [Louisiana] constitutional and statutory pay plan powers and responsibilities by enacting a pay plan law without prior approval of Defendant CSC," (2) the Challenged Ordinances violate the Contract Clause of the United States and Louisiana Constitutions, and (3)  the ordinances violate Louisiana's constitutional prohibition on taking a "business enterprise or any of its asserts . . . for the purpose of operating that enterprise or halting competition with a government enterprise."[7] While a motion for a preliminary injunction was pending, the City filed a notice of removal, after which the case was transferred to this Section as related to the Consent Decree.[8]

Plaintiffs moved to remand and CSC filed a motion to dismiss for lack of jurisdiction. After briefing and a hearing, the Court denied both motions.[9]  The Court then granted permission to intervene to the United States, Police Association of New Orleans (PANO),

---

[6]Trial Exhibits 4-8.

[7]R. Doc. 1-2, pp. 6-7.

[8]Plaintiffs filed another suit asserting claims concerning CSC's jurisdiction similar to those made in this case as well two different causes of action (under the Fair Labor Standards Act and Federal Insurance Contributions Act), but asking for the same ultimate relief with respect to secondary employment. *Powers v. City of New Orleans*, No. 13-5819 (E.D. La. filed Sept. 12, 2013).  That action also was transferred to this Court, and Plaintiffs later voluntarily dismissed the case.

[9]R. Doc. No. 47.

and Captain Michael Glasser, President of PANO.[10]  The CSC also filed a cross claim against

the City of New Orleans, seeking a declaratory judgment that the Challenged Ordinances

violated CSC's constitutional jurisdiction over payment of civil servants, and that the City

was required to obtain CSC's approval in setting pay rates for secondary employment.[11]

        With those preliminary matters concluded, the Court held a hearing on Plaintiffs'

motion for a preliminary injunction.  The Court then issued an Order and Reasons denying

this request for relief.[12]  The Court concluded that Plaintiffs, PANO, and CSC failed to show

likelihood of success on the merits of any of their claims; in particular, the Court concluded

that (1) CSC lacks jurisdiction over secondary employment, (2) assuming Plaintiffs had

contracts with private entities to perform paid details, they could not show substantial

impairment in light of the historic regulation of paid details, and (3) Plaintiffs did not show

any of the elements of their Louisiana constitutional anti-expropriation claim.[13]

        The Court then issued a scheduling order.  In the interest of economy,  pursuant to

Rule 42(b) the Court bifurcated the proceedings and set the following issues for a first trial

phase: (1) "[w]hether the challenged Ordinances infringe on the jurisdiction of the Civil

Service Commission," (2) "[w]hether any contractual relationships exist and, if so, whether

those contractual relationships were substantially impaired by the challenged Ordinances,"

and (3) "[w]hether the challenged Ordinances took any business enterprise or assets for the

---

        [10]R. Doc. No. 48.  PANO and Glasser assert only that the Challenged Ordinances
infringe on the CSC's jurisdiction.  Glasser does not assert a contractual impairment claim.
PTO § 7, ¶¶ 40-42.

        [11]R. Doc. 65 at 9-10.

        [12]R. Doc. 71.

        [13]*Id.* at 6-11.

purpose of operating that enterprise or halting competition with a government enterprise."[14]

The Court held a three-day non-jury trial on these issues on February 5 through 7, 2014, and now issues these findings of fact and conclusions of law.

## FINDINGS OF FACT

### A.  Contract Clause and Anti-Expropriation Clause Facts

1.  The Court heard testimony from Plaintiff Captain Frederick C. Morton, and Plaintiff Sergeant Walter Powers, Jr., regarding their prior history of secondary employment. The Court also heard testimony from John Cummings regarding his prior business dealings with Morton.

2.  Plaintiff Powers had not coordinated[15] other officers working private details for several years preceding enactment of the Challenged Ordinances. At the time of the enactment of the Challenged Ordinances, he worked individual private details himself but had no contractual agreements to perform that work.[16]

3.  At the time of the enactment of the Challenged Ordinances, Plaintiff Morton coordinated private details for individual events for John Cummings, owner of the Sugar Mill, an event venue.  Morton also sometimes worked details for individual

---

[14]R. Doc. 136.

[15]Under the secondary employment system as it existed before the Challenged Ordinances and OPSE regulations, individual officers could (1) work a paid detail by performing the tasks assigned by the private third-party employer or (2) "coordinate" details for private employers by recruiting and assigning officers to work those details.  *See* Pretrial Order, R. Doc. 179 ("PTO") § 7, ¶ 75; NOPD Operations Manual chap. 22.8 at 1-2, (P. Ex. 1 at 00001-2).  OPSE now fulfills the role of "coordinator."  Testimony of John Salamone.

[16]Trial testimony of Sergeant Powers; Pretrial Order, R. Doc. 179 ("PTO") at ¶ 52-55.

events at the Sugar Mill.  Cummings paid Morton a flat fee of $145 for coordinating other officers working an event and $35 per hour for Morton's working the detail.[17]

4.   There was no credible testimony that Cummings and Morton ever agreed, orally or in writing, that (1) Cummings was obligated to call Morton to coordinate or work details or (2) Morton was obligated to coordinate or work details for any particular event offered by Cummings.  Morton testified only that he believed he had an enforceable agreement to the extent that he could pursue legal remedies if Cummings failed to pay him after he actually worked or coordinated a detail. Cummings testified that he had used other providers to coordinate and work details at the Sugar Mill.[18]

**B.   Civil Service Commission Jurisdiction Facts**

5.   The Court heard testimony from Lisa Hudson, Personnel Director for the CSC, regarding CSC rules and practices.

6.   CSC regulates pay for the classified civil service for the City of New Orleans.[19]

7.   Secondary employment has been performed for many years by NOPD officers.  CSC has never regulated or attempted to regulate paid details or secondary employment and has never set rates for that off-duty work by NOPD officers.[20]

8.   The Court heard testimony from Deputy Mayor Andrew Kopplin and OPSE Director John Salamone regarding OPSE and the practices of the City of New Orleans.

---

[17]Trial testimony of Captain Morton and John Cummings; PTO at § 7 ¶ 56, 60.

[18]Trial testimony of Captain Morton and John Cummings.

[19]Trial testimony of Lisa Hudson.

[20]PTO at § 7, ¶ 50.

9.      OPSE is an office of the City of New Orleans created to comply with the Consent Decree's mandate for a Secondary Employment Coordinating Office.[21]

10.     Secondary employment is performed at the officer's option and, by definition, is performed when an NOPD officer is off-duty.[22]  Moreover, secondary employment is by definition for private third-party employers because the Consent Decree prohibits secondary employment for City of New Orleans departments or agencies.[23]

11.     Under the challenged Ordinances and the policies and procedures of OPSE, private third-parties pay to OPSE an hourly rate set by Ordinance for secondary employment, as well as an administrative fee.  OPSE passes through the hourly fee to the NOPD officer who worked the secondary employment, using the NOPD payroll system.[24]

12.     OPSE is not a profit-making venture and any administrative fees collected in excess of the amounts actually necessary to run the office are transferred to the NOPD officers who worked secondary employment.[25]

13.     NOPD maintains control over whether any individual officer is permitted to work Secondary Employment.[26]

---

[21]Trial testimony of John Salamone.

[22]Consent Decree at ¶ 332, 363(g); PTO at § 7, ¶ 49.

[23]Consent Decree at ¶ 361.

[24]New Orleans Ordinances 25428 M.C.S. 90-121, 90-122 (Ex. 5 at 00317); Testimony of John Salamone.

[25]New Orleans Ordinances 25428 M.C.S. 90-121, 90-122 (Ex. 5 at 00317); Testimony of John Salamone.

[26]Testimony of John Salamone; PTO at § 7, ¶¶ 77, 79, 90.

14. Payment for secondary employment comes from third-party private citizens.[27] Participation in secondary employment is voluntary and neither OPSE nor the NOPD can require any NOPD officer to work secondary employment.[28] Once an officer is matched to a secondary employment job, the third-party private citizen directs how that officer performs the job, not OPSE.[29]

## CONCLUSIONS OF LAW

### I.    Jurisdiction & Venue

1. This case was properly removed.[30]   The Court has jurisdiction over the Constitutional challenge under 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the state-law claims pursuant to 18 U.S.C. § 1367.  Venue is proper pursuant to 28 U.S.C. § 1391(b) because the events giving rise to these claims occurred in this judicial district.

### II.   Contractual Impairment Claims

2. Article I, section 10 of the United States Constitution states "No state shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. Art. I, § 10, cl. 1. The Louisiana Constitution contains a "substantially equivalent" provision.  *See Bd. of Comm'rs of Orleans Levee Dist. v. Dep't of Natural Res.*, 596 So. 2d 281, 291 (La. 1986).  This prohibition is not absolute and "must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'"  *Energy*

----

[27]Testimony of John Salamone.

[28]Testimony of John Salamone; PTO at § 7, ¶ 49.

[29]Testimony of John Salamone.

[30]*See* R. Doc. 47 at 4 (resolving motion to remand).

*Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983) (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934)).

3.  "The threshold inquiry is 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.'" *Id.* at 411 (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)). The analysis begins "by identifying the precise contractual right that has been impaired and the nature of the statutory impairment." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 504 (1987). Thus, the Contracts Clause applies only to substantial impairment of existing contracts and not prospective interference with a generalized right to enter into future contracts. *See Energy Reserve Grp.*, 459 U.S. at 410; *see also Fed. Sav. & Loan Ins. Corp. v. Griffin*, 935 F.2d 691, 698 (5th Cir. 1991).

4.  The Court looks to Louisiana law to determine whether Powers or Morton were parties to any contracts which might have been impaired by the Challenged Ordinances. *See Page v. Gulf Oil Corp.*, 775 F.2d 1311, 1315 (5th Cir. 1985).

5.  "A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." La. Civ. Code art. 1906. "An obligation is a legal relationship whereby a person, called the obligor, is bound to render a performance in favor of another, called the obligee." La. Civ. Code art. 1756.

6.  Powers had not coordinated details for three years prior to enactment of the Challenged Ordinances and his counsel conceded that Powers was not a party to any contracts at the time of the enactment.[31] Powers had no contractual rights to be

---

[31]Closing argument; Trial testimony of Sergeant Powers; PTO at ¶ 52-55.

impaired by the Challenged Ordinances at the time the Ordinances were adopted.

7.   Morton had in the past completed a series of oral contracts with Cummings to coordinate and/or work security for individual events at the Sugar Mill.  Pursuant to those single-event oral contracts, Morton was bound to coordinate or work a given event, and Cummings was bound to pay him the agreed-upon rate for that event.[32]

8.   The testimony at trial established that, at the time the Challenged Ordinances were adopted, there was no agreement pursuant to which Cummings was *obligated* to pay Morton to coordinate or work security for any future details at the Sugar Mill, or Morton was *obligated* to accept responsibility to coordinate or work any future details.  At most, they had a prior course of dealing that established a hope they would continue to work together in the future and established rates of pay in the event they did.  But that understanding was no more than "the rules of the game in the event that the parties decide to play ball."  *See Page v. Gulf Oil Corp.*, 775 F.2d 1311, 1315 (5th Cir. 1985) (finding that "blanket agreement" governing terms for future contracts but not identifying time, place, or type of performance was not itself a contract binding either party to any performance).

9.   There can be no impairment, unconstitutional or otherwise, of nonexistent contractual rights.  Accordingly, Morton and Powers failed to prove that the Challenged Ordinances and the establishment of OPSE impair any contractual rights in violation of the United States and Louisiana Constitutions.

10.   Morton and Powers lack standing to assert constitutional impairment claims on

_____

[32]Trial Testimony of Morton and Cummings; PTO at ¶ 56-62.

behalf of other NOPD officers who may have had contractual relationships at the time of the enactment of the Challenged Ordinances.  *See Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciente*, 125 F.3d 9, 12 n.5 (1st Cir. 1997); *Maine Educ. Ass'n Benefits Trust v. Cioppa*, 842 F. Supp. 2d 373, 385 (D. Me. 2012).

## II.    Louisiana Anti-Expropriation Claim

11.    Article 1, § 4(B)(6) of the Louisiana Constitution states "No business enterprise or any of its assets shall be taken for the purpose of operating that enterprise or halting competition with a government enterprise."

12.    Plaintiffs offered no meaningful evidence or persuasive argument that individual officers working paid details were a "business enterprise" within the meaning of this Article.  Indeed, Chapter 22.8 of the NOPD Operations Manual expressly prohibits officers "from forming any corporation, company, trust, fund, or cooperative banking account for the purpose of billing, receiving compensation, or offering services of paid details."[33]  Accordingly, Plaintiffs failed to carry their burden of proof on this claim.

## III.    CSC jurisdiction

13.    The Louisiana Constitution establishes the "city civil service" which "includes all persons holding offices and positions of trust or employment in the employ of each city having over four hundred thousand population and in every instrumentality thereof."  La. Const. Art. 10, § 1(B).

---

[33]Trial Exhibit 1 at 00008.

14.    The Louisiana Constitution endows the New Orleans Civil Service Commission with "broad and general rulemaking and subpoena powers for the administration and regulation of the classified service, including the power . . . to adopt a uniform pay and classification plan."  La. Const. Art. 10, § 10(A)(1).

15.    CSC's rules define "Classified Service" as "all offices and positions of trust or employment in the city service, except those placed in the unclassified service by Section 2 of Article X of the Constitution of Louisiana."[34]  "City Service" is defined as "all offices and positions of trust or employment with the city, any department, agency, board or commission thereof, or corporation organized for public purposes, including persons employed by city or joint federal and city agencies administering city and federal relief and other funds, other than the military and naval service, irrespective of whether the pay for the offices and positions of trust or employment be paid out of the city treasury either in whole or in part, except those excepted by the provision of Article X of the Constitution of Louisiana."[35]

16.    Prior to entry of the Consent Judgment, adoption of the Challenged Ordinances, and creation of OPSE, it was settled that the Civil Service Commission had no jurisdiction over off-duty paid details.  *See Hebert v. New Orleans Police Dep't*, 805 So. 2d 345, 352 (La. App. 4 Cir. 2001).

17.    Secondary employment after approval of the Consent Decree, even as modified by the Challenged Ordinances and overseen by OPSE, is still work at the officer's election for private non-City entities while off-duty.   Therefore, secondary

---

[34]Civil Service Rule I, § 1, ¶ 10 (Exhibit 16 at 00405).

[35]*Id.* § 1, ¶ 10 (00405).

employment is not city service and remains outside the CSC's jurisdiction. The rates for secondary employment set by the Challenged Ordinances do not infringe on any matter within the CSC's jurisdiction.

18.    The Challenged Ordinances and the creation of OPSE do not modify the nature of secondary employment in a manner that makes NOPD officers employees of OPSE or the City when doing that off-duty work. Payment for secondary employment still comes from third-party private citizens or entities. The fact that the hourly rate paid by third parties for secondary employment is transmitted to NOPD officers through the NOPD payroll system does not change the source or character of those payments, and does not make NOPD officers the employees of OPSE or the City while doing that secondary employment work.

19.    Participation in secondary employment is still at the officer's option and OPSE cannot make any NOPD officer work secondary employment. Once an officer is matched to a secondary employment job, the third-party private citizen or entity directs how that officer performs the job, not OPSE. In short, OPSE is no more the "employer" of officers performing secondary employment than was the coordinating officer their employer under the pre-Consent Decree paid detail system.

20.    The fact that the Challenged Ordinances use officer rank as a benchmark for setting the rates charged to third parties for officers performing secondary employment has no legal significance with respect to CSC's jurisdiction.

21.    The "economic realities/common law control test" which applies in Title VII cases

to determine "whether a party is an employee or an independent contractor"[36] has no bearing on whether NOPD officers performing secondary employment for private citizens or entities are acting as employees of OPSE or the City.

22.    The "borrowed employee" analysis is a legal defense to an employer's vicarious liability for an employee's torts and has no bearing on whether the OPSE regime makes City employees of NOPD officers performing secondary employment. *See Morgan v. ABC Mfr.*, 701 So. 2d 1077, 1081 (La. 1998).

23.    Under federal law, secondary employment of law enforcement personnel may be coordinated through a system similar to OPSE without entitling those personnel to overtime pay by their state employer. *See* 29 U.S.C. § 207(p); 29 C.F.R. § 553.227(a), (d). Although entitlement to overtime pay is not at issue in this case, the existence of this exception does tend to support the conclusion that an officer engaged in secondary employment under the Challenged Ordinances and pursuant to the policies and procedures of OPSE is not doing so "in the city service."

24.    To sum up, secondary employment, or the authority to set rates for secondary employment, was not within CSC's jurisdiction before the Challenged Ordinances were adopted or OPSE was created, and it is not within CSC's jurisdiction now.

## CONCLUSION

The Court bifurcated the issues addressed herein and reserved all other claims and issues "for subsequent proceedings, if necessary."[37] These findings of fact and conclusions of law are dispositive of the claims asserted by Plaintiffs, CSC, PANO, and Glasser.

---

[36]*Juino v. Livingston Parish Fire Dist. No. 5*, 717 F.3d 431, 434 (5th Cir. 2013).

[37]R. Doc. 136 at 2.

Accordingly, no further proceedings are necessary and a final judgment will issue.  Thus, in light of the foregoing facts and conclusions of law, **IT IS ORDERED** that:

Plaintiffs' claims for declaratory judgment and injunctive relief against enforcement of the Challenged Ordinances against the City of New Orleans, Mayor Mitchell Landrieu, Superintendent Ronal Serpas, CSC, and Kevin Wildes, are **DISMISSED WITH PREJUDICE**.

CSC's and Kevin Wilde's cross claim for declaratory relief against the City of New Orleans is **DISMISSED WITH PREJUDICE**.

PANO and Glasser's claim in intervention for declaratory relief against the City of New Orleans is **DISMISSED WITH PREJUDICE**.

**New Orleans, Louisiana, this 7th day of April, 2014.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

15